J. R. BORING, d/b/a B & B Swine,
Appellee,

v.

GEIS IRRIGATION COMPANY, a Kansas
Corporation, Appellant.

No. 47511.

Court of Appeals of Oklahoma,
Division No. 1.

July 22, 1975.

As Corrected on Denial of Rehearing

Sept. 23, 1975.

Certiorari Denied Feb. 24, 1976.

Released for Publication by Order of Court
of Appeals Feb. 26, 1976.

Ogden, Ogden & Board, Guymon, and Benefield, Shelton, Lee, Wilson & Tyree by Jim W. Lee, Oklahoma City, for appellee.

Dale, Belanger & Wright by Jan Michael Belanger, Guymon, for appellant.

BOX, Judge:

An appeal by Geis Irrigation Company, defendant in the trial court, from a jury verdict and judgment entered by the District Court of Texas County, in favor of J. R. Boring, plaintiff below.

In 1971, Mr. Boring and Geis Irrigation Company (referred to hereafter as "Geis") entered into a contract by the terms of which Mr. Boring agreed to buy and Geis agreed to sell various items and install certain bulk storage tanks, augers, elevator leg and other equipment at Mr. Boring's feedlot near Guymon, Oklahoma. After Geis completed the installation of this equipment Mr. Boring attempted to make his new facility a fully operational swine feeding business. From the beginning, however, numerous difficulties with the equipment plagued his business and, in response to Mr. Boring's complaints, Geis attempted to repair the equipment. Mr. Boring also expended some of his own money in an effort to alleviate the difficulties. But all attempts failed to solve many of the problems and finally, after negotiations between the parties failed, Mr. Boring brought suit for breach of express and implied warranties with respect to both the goods and services. A jury trial on these issues resulted in a verdict in Mr. Boring's favor for the amount of $50,000.00.

Geis seeks a new trial on two grounds—first, it contends that the trial court erred by admitting into evidence testimony concerning certain settlement negotiations between the parties, and second, it urges that the evidence regarding lost profits was too speculative to permit an instruction to the jury on this issue.

I.

The dispute concerning the settlement negotiations arose from a letter addressed to Mr. Boring, authored by the sales manager for Geis, Mr. Kasperi. The record does not reveal the exact nature or extent of these negotiations but it appears that

Mr. Boring had demanded the removal of the equipment installed and had refused to pay the balance of the amount owed Geis. In his letter Mr. Kasperi referred to a previous conference with Mr. Boring and a proposal he made at this meeting to correct problems with three storage tanks. The letter continued as follows:

"To date you have indicated that our attempts to correct the leakage problem in these tanks have not been successful. You feel that without totally dismantling these tanks and properly chalking as they are reconstructed that they will never be watertight and therefore not satisfactory to you.

"We propose the removal of these tanks, a reduction in our billing to you of an amount of the cost of the tanks plus erection and furnish the equipment to remove the tanks. You then may purchase replacement tanks of your own choice.

". . .

"We also will pay the labor charge of Mr. Kattke for work performed and furnish equipment to remove and set tanks as previously stated.

"I trust that this proposal will meet with your approval and that this matter can be brought to a conclusion in the very near future. . . ."

At trial, counsel for Mr. Boring offered the letter in evidence. The trial judge sustained Geis' objection on the express ground that the letter involved an offer to compromise a disputed claim and therefore was inadmissible. Despite the trial judge's unequivocal ruling, plaintiff's counsel apparently sought to bring out the facts of the offer by eliciting them, over objection, from Mr. Kasperi on cross-examination. This is demonstrated by the following colloquy:

"Q  Mr. Kasperi, let me ask you a couple of other questions. Maybe I have gone over this before but I don't remember it. If I have I apologize. Would it be a fair statement since you agreed to take—*let me ask you did you agree or offer to Mr. Boring to take down the leaky bins and replace them*? I beg your pardon. Let me ask—

"MR. BELANGER: I would like to approach the bench.

"THE COURT: Just a minute.

"MR. BELANGER: I ask the jury be admonished to disregard it. I object to taking the tanks down and replacing the tanks.

"THE COURT: *We will not get in negotiations.*

"MR. LEE: I'm going to ask him his opinion if they had to be taken down.

"THE COURT: *I will not let settlement in.*

"Q  Let me ask you, Mr. Kasperi, if you have heretofore offered to take—

"MR. BELANGER: We object, Your Honor.

"THE COURT: It will be overruled within the limits I have set.

"MR. BELANGER: May I approach the bench?

"THE COURT: Yes. (Discussion had.) Both of you understand what I said can't be. Mr. Lee, you understand what I said can't come in?

"MR. LEE: Yes.

"THE COURT: All right. Let's go ahead.

"MR. LEE: Is the objection overruled?

"THE COURT: Yes, sir.

"Q  Let me go back. Maybe I can help some on the objection, Judge. Mr. Kasperi, as I understand your testimony you agree that the tanks you all installed leaked?

"A  The last time I was on the location when I checked them they showed a small amount of moisture inside. Yes.

Q *It is also true, is it not, you agreed to take down the tanks, remove them and pay for the installation of other tanks?*

"MR. BELANGER: *We object and move for mistrial.*

"THE COURT: Please. I have said what both sides can do. Both sides know what my ruling is on this thing. I am going to allow him latitude in cross-examination but I am not going to get into the other area. Let's proceed. It will be overruled." (Emphasis added.)

■ Mr. Boring urges that the questions asked by counsel did not constitute an impermissible inquiry into settlement negotiations because the offer was made some six months before the lawsuit was filed. He correctly notes that the exclusionary rule is not invoked when the offer to pay or settle a claim was tendered prior to the existence of a controversy between the parties. *Miller v. Campbell Commission Co.*, 13 Okl. 75, 74 P. 507; *Cherry Brothers Trading Company v. Rock Island Implement Company*, 89 Okl. 201, 214 P. 559; McCormick *Evidence* § 274 (2nd Ed., Cleary, 1972). The question whether to apply the exclusion must be resolved by determining whether an actual controversy existed when the offer was tendered. The fact that suit was not yet filed is not determinative. *City of Anadarko v. Argo*, 35 Okl. 115, 128 P. 500.

■ It appears that a controversy sufficient to invoke the exclusionary rule exists at least where one party has made a claim and there are apparent differences of view between the parties as to the validity or amount of that claim. See 31A C.J. S. *Evidence* § 285 and McCormick, supra, § 274. We think this case falls within this definition of a controversy. There was a controversy between the parties before Mr. Kasperi made the written offer in behalf of Geis. Mr. Boring had refused to continue paying on the account and was demanding specific relief from Geis. Mr.

Kasperi met with Boring in an effort to resolve the differences between them and then made the proposal to remove the three storage tanks. The letter containing his offer was therefore properly excluded as tendered in expectation of a compromise of a matter in controversy. *City of Anadarko v. Argo*, supra. Likewise, any testimony concerning the offer and anything related to the effort to compromise was inadmissible.

■ Mr. Boring also asserts that both the letter and oral testimony concerning the settlement offer were admissible because the letter contained unqualified admissions of fact independent of the offer, which are not protected by the exclusionary rule. *Kunkel v. Rattray*, 110 Okl. 289, 231 P. 541. However, we do not see any express admissions of fact or liability in the letter and thus find no merit in this contention.

Since any inquiry into the settlement negotiations was improper, was Geis prejudiced by the interrogation of Mr. Kasperi on cross-examination concerning his offer to Mr. Boring? Geis contends that counsel for Mr. Boring succeeded in drawing out the substance of the proposal, as set out in Mr. Kasperi's letter. But we feel that Mr. Boring was far less successful in disclosing the facts of the settlement offer than Geis suggests. Both times counsel elicited information concerning the settlement proposal an objection was made and the trial judge remarked that he would not permit disclosure of any facts regarding settlement negotiations. After these admonitions the trial judge overruled Geis' objections, apparently feeling that counsel's questions did not reach the substance of the settlement proposal. However, Mr. Kasperi never responded to either question and counsel proceeded to other matters. Since no answer was given, the existence of any settlement negotiations and the details of the proposal remained undisclosed. The only hint of an offer to compromise appears in the unanswered questions: "Did you agree or offer to Mr. Boring to take

down the leaky bins and replace them?" and "It is also true, is it not, you agreed to take down the tanks, remove them, and pay for the installation of other tanks?"

■ Any remark or query by counsel regarding settlement negotiations must be course, be closely scrutinized and any doubt about its prejudicial effect should be resolved in favor of the complaining party. But, whether the rule of exclusion is considered to be grounded primarily upon public policy, relevance, or privilege (See 4 Wigmore, Evidence § 1061 (Chadbourn Rev. 1972), the mere suggestion of settlement negotiations should not warrant an automatic reversal. *Grooms v. Johnson*, 192 Okl. 527, 138 P.2d 98. From a review of the proceedings, we conclude that counsel's questions alone, though clearly improper, could not have prejudiced the minds of the jury.

## II.

We turn to the issue of lost profits. The substance of Mr. Boring's right to relief for loss of profits was that he expected his feed lot to be capable of handling 10,000 swine per year; that he relied on Geis' recommendations, representations and warranties when he purchased the equipment to accomplish his purpose and that because the equipment failed to operate as warranted he was able to feed only 2,777 swine, resulting in a net profit of $18,679.-25 and that, based on a net profit of $8.20 per head during this period, he would have realized an additional net profit of $63,328.60 had he been able to feed the full number of swine contemplated.

Mr. Boring testified that he had initiated arrangements to obtain the necessary financing to enable him to house and feed 10,000 swine per year prior to purchasing the equipment from Geis and that part of the needed expansion was completed before installation of the equipment. According to Mr. Boring it would have taken no more than six weeks to conclude expansion of his facility to handle 10,000 swine but he abandoned attempts to finish the expansion when the equipment failed to function adequately enough to feed that many swine. He was also of the opinion that his costs in feeding all 10,000 swine would have been approximately the same per unit.

■ Although the evidence was conflicting and Mr. Boring's evidence regarding the amount of damages is in some respects vague, we believe it was sufficient to warrant recovery of lost profits. So long as the plaintiff offers a reasonable factual basis for estimating the loss of profits resulting from the defendant's breach of warranty, he may recover such damages as against the contention that the profits expected through use of the goods are too speculative. Precision in proof of the loss is not required. *Robbins v. Trotter*, 203 Okl. 68, 217 P.2d 1027; *Bishop-Babcock-Becker Co. v. Estes Drug Co.*, 63 Okl. 117, 163 P. 276; see also Uniform Commercial Code Comment 3 at 12A O.S.A. 1971, § 2–715.

The jury could conclude from the evidence that if the equipment had performed as warranted and if the installation had been proper, Mr. Boring would have purchased and fed all 10,000 swine at approximately the same price and cost per unit and that he would have realized a profit at about the same per unit figure he obtained from the feeding and selling of the 2,777 swine. Moreover, there was ample evidence to warrant the further conclusion that Mr. Boring had informed Geis of his plans to feed 10,000 swine in the first year of operation and that Geis expressly warranted that the equipment it sold and installed would enable Mr. Boring to mix enough feed to support a feeding operation of that size and that Geis was therefore fully informed of the circumstances which would make Mr. Boring's loss of profits a reasonably foreseeable consequence of its breach.

The judgment of the trial court is affirmed.

Affirmed.

ROMANG, P. J., and REYNOLDS, J., concur.